UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CURTIS G.,[1] | Case No. 18-cv-03052-TSH |
| Plaintiff, | |
| v. | **ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| NANCY A. BERRYHILL, | Re: Dkt. Nos. 23, 27 |
| Defendant. | |

## I.     INTRODUCTION

Plaintiff Curtis G. brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of Defendant Nancy A. Berryhill, the Acting Commissioner of Social Security, denying his claim for disability benefits.  Pending before the Court are the parties' cross-motions for summary judgment.  ECF Nos. 23, 27.  Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument.  Having reviewed the parties' positions, the Administrative Record ("AR"), and relevant legal authority, the Court hereby **DENIES** Plaintiff's motion and **GRANTS** Defendant's cross-motion for the following reasons.

## II.     BACKGROUND

### A.     Age, Education and Work Experience

Plaintiff is 50 years old.  AR 154.  He was in special education classes from the fourth to sixth grades and did not finish school past the ninth grade or earn a GED.  AR 45, 243.  Vocational testing showed he was only able to read at about a fifth or sixth grade level.  AR 255.

---

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

When Plaintiff was 19 or 20, he was convicted of a felony (possession of a controlled substance) and served time in prison for one year. AR 242. He has been in prison five times, twice for possession, once for assault, and twice for parole violations. *Id.* After his release, Plaintiff saw other ex-cons with jobs and cars and he asked them how they had come to be successful. *Id.* They told him they had joined a construction labor union and he followed their lead and did the same. AR 242-43. Plaintiff subsequently worked as a construction/demolition laborer from about 2006 to 2013. AR 171, 174-81, 246, 252. On January 24, 2013, he was on a jobsite performing demolition when he suddenly stepped and dropped three to four feet in an open trench. AR 408. His left foot hit a bracket and caused a twisting –type of injury. *Id.* He has not returned to work since. *Id.*

**B.    Medical Evidence**

**1.    2013**

The first record of Plaintiff's treatment after the accident is on January 25, 2013, at a clinic called "Doctors on Duty" in San Jose, California. Jacqueline Delyaei, M.D., noted that Plaintiff reported joint stiffness, limb pain (left foot) and myalgias. AR 315. Plaintiff was using crutches at the time and a gait exam revealed a left leg limp. AR 316. X-rays taken of the left foot showed a fracture: close/oblique with dislocation fracture of the proximal 4th metatarsal. AR 312. Dr. Delyaei diagnosed closed fracture of metatarsal(s), foot pain and laceration of leg. AR 316. Plaintiff saw Dr. Delyaei again on January 30, 2013, at which time he reported symptoms of bruising, swelling and lacerations on his left lower leg. AR 311. She referred him to an orthopedic doctor. AR 313.

Plaintiff saw Samir Sharma, M.D. on January 30, 2013. AR 319. Dr. Sharma reviewed the same x-rays and determined they showed a second and third metatarsal fracture. *Id.* Upon exam, Dr. Sharma found everything "normal" with the left foot but diagnosed him with "second and fourth metatarsal nondisplaced fractures." AR 319-21. Dr. Sharma prescribed a fracture boot and told Plaintiff it would take six to eight weeks for the metatarsal fractures to heal. AR 321. Dr. Sharma also prescribed physical therapy. *Id.*

On March 27, 2013, Dr. Sharma indicated that the second and fourth[2] metatarsal fractures were healed. AR 355. Dr. Sharma wrote Plaintiff could discontinue use of the boot but needed to continue physical therapy, and that he could return to work that day, limited to seated work only. *Id.*

On May 8, 2013, Dr. Sharma indicated Plaintiff had subjective complaints of left foot pain with x-rays showing healing of fourth and fifth metatarsals. AR 356. Objective findings were left foot swelling with pain at the fourth and fifth metatarsals. *Id.* Dr. Sharma indicated Plaintiff could return to modified work on May 8, 2013 and full duty on June 24, 2013. *Id.* Dr. Sharma further noted Plaintiff could sit for 40 minutes per hour, stand for 20 minutes per hour, and could perform work mostly seated with no prolonged standing. *Id.*

During the time he saw Dr. Sharma, Plaintiff also went to physical therapy at Burlingame Therapeutic Associates. AR 557-64. His treatment plan included exercise, gait training, manual therapy, and heat/ice. AR 558.

On July 11 and August 9, 2013, Plaintiff went to the emergency room due to left foot pain. AR 373-76, 570-73. X-rays taken at the July 2013 visit showed healing fractures at the bases of the second, third and fourth metatarsals, with a fracture at the base of the second metatarsal bone extending into Lisfranc's joint. AR 571-72. The x-rays also showed osteopenia involving the entire left foot. AR 572. The x-ray taken on the August 2013 visit showed that the metatarsal fractures were well healed with mild resultant deformity of the fourth proximal metatarsal. AR 375. There was prominent osteopenia. *Id.*

On August 7, 2013, Plaintiff saw Dr. Bruce Lehnert, a doctor of podiatric medicine. AR 663. Musculoskeletal exam showed a left rigid hindfoot with tenderness to palpation on the talonavicular joint and lateral aspect of the subtalar joint. AR 664. Dr. Lehnert assessed that Plaintiff had complex issues with his left ankle and had either a peroneal spasm or a rigid flatfoot causing most of his symptoms. *Id.* He also assessed that Plaintiff had well-healed fractures at the second and fourth metatarsal. *Id.* He recommended an MRI, which Plaintiff underwent on

---

[2] As discussed below, Dr. Sharma referred to different-numbered metatarsal fractures at Plaintiff's visits.

September 5, 2013. AR 664-66. It showed evidence of a dorsal hooked osteophyte of the talar head and neck, with mild focal chondral thinning versus erosion of the medial talar dome anteriorly, and to a lesser degree the talar plafond. AR 665. After reviewing the MRI on September 13, 2013, Dr. Lehnert recommended surgery – a triple arthrodesis with possible Achilles tendon lengthening – but indicated he would not perform this surgery until Plaintiff stopped smoking. AR 662.

On September 27, 2013, Dr. Lehnert indicated that Plaintiff was "temporarily totally disabled" and his "work restrictions would include only sedentary work," which did not include "his usual and customary position of a laborer." AR 660.

On October 11, 2013, Dr. Lehnert told Plaintiff to stop smoking and that if he did not, there was nothing more he could do because the surgery would not be successful without smoking cessation. AR 659. By December 6, 2013, Plaintiff had stopped smoking. AR 655. In a letter to Plaintiff's worker's compensation insurance company, Dr. Lehnert requested authorization to perform triple arthrodesis and tendo Achilles lengthening procedures. AR 655-56. Dr. Lehnert noted Plaintiff continued to use a cane and walked with a distinct limp. AR 655. He assessed that Plaintiff had hindfoot arthrosis secondary to his industrial injury. AR 656. Dr. Lehnert provided the following impression: "A triple arthrodesis with either a gastrocnemius recession or a tendo Achilles lengthening is medically necessary. He has the high likelihood of a union given he has stopped smoking his two packs of cigarettes per day." *Id.*

### 2.    2014

After Plaintiff's insurance company denied the request for surgery on December 19, 2013,[3] Dr. Lehnert wrote a letter of appeal on January 7, 2014. AR 652-53. He noted that the doctor who issued the denial was not an orthopedic foot and ankle surgeon nor a podiatrist. AR 652. Dr. Lehnert stated that Plaintiff had fractures of the second, third, and fourth metatarsal bones and had been diagnosed with hindfoot arthrosis. *Id.* Plaintiff also had a rigid flatfoot on the left and simple flexible flatfoot on the right. AR 652-53. Dr. Lehnert noted that on one of his visits he had

---

[3] The denial is not part of the record.

4

Plaintiff try a 20-minute walk and he came back hobbling in pain. AR 653. He further noted that Plaintiff had already tried conservative care, shoe modifications and bracing. *Id.* During the same visit, Dr. Lehnert gave Plaintiff a lidocaine injection into the left foot. *Id.* Within five minutes of the injection, Plaintiff's foot "was more than 95 percent pain free." *Id.*

Plaintiff saw Dr. Lehnert again on February 4, 2014. AR 650-51. Physical examination showed stiffness of the hindfoot with tenderness to palpation in the lateral margin of the subtalar joint and mostly and significantly around the talonavicular joint. AR 650. Plaintiff had a rigid flatfoot with an associated equinus. *Id.* Dr. Lehnert noted Plaintiff had almost 100% relief with the previous injection and reiterated that he should have the surgery. *Id.*

Plaintiff saw Dr. Lehnert again on March 4, 2014. AR 381-82. Plaintiff was having pain across the posterior heel because of his altered gait. AR 381. Dr. Lehnert once again reiterated that Plaintiff should have surgery. *Id.*

On March 27, 2014, Plaintiff saw Dr. Jay Benard, a doctor of podiatric medicine. AR 407-13. Plaintiff told Dr. Benard that he generally was in pain and rated it as 5 out of 10 but it increased to 8-9 with minor activity. AR 408. Walking one block caused pain and he had difficulty walking up and down stairs, as well as on uneven surfaces. *Id.* A musculoskeletal exam showed that Plaintiff's gait had significant antalgia on the left with the left lower extremity being apropulsive. AR 409. There was pain on palpation over the left midtarsal joint medially more so than laterally as well as tenderness to palpation over the lateral aspect of the rearfoot. *Id.* Muscle testing revealed +5/5 in the right lower extremity with the left extensor tendons noted to be 4.5/5 and the peroneal tendons on the left lower extremity being 4/5. *Id.* Ankle joint range of motion was noted to be 15 degrees of dorsiflexion and 45 degrees of plantar flexion on the right with knees flexed, and 5 degrees of dorsiflexion the left with 20 degrees of plantar flexion. *Id.* Subtalar joint range of motion on the right was noted to be 30 degrees of inversion with 20 degrees of eversion. *Id.* Left subtalar joint was noted to have 5 degrees of inversion and 5 degrees of eversion. *Id.* Metatarsophalangeal joint range of motion at the first MPJ was noted to be 80 degrees of dorsiflexion and 20 degrees of plantar flexion bilaterally. *Id.*

Based on his review of Plaintiff's medical records and his exam, Dr. Benard diagnosed

status post multiple metatarsal fractures left foot with posttraumatic degenerative joint disease left midtarsal joint, subtalar joint, with chondral injury medial ankle joint.  AR 411.  He opined that Plaintiff had a significant injury to his ankle and that he needed further treatment.  *Id.*  Dr. Benard took into account the following objective factors of impairment: decreased range of motion, left ankle joint and left subtalar joint; antalgic gait with peroneal spasm; and x-ray and MRI findings consistent with posttraumatic degenerative changes at the talonavicular joint, subtalar joint, and to a lesser degree the left ankle joint.  AR 412.  He assessed that due to the advanced degenerative changes of the midtarsal joint and subtalar joint, surgery would be the best option and recommended the type of surgery that Dr. Lehnert recommended – a triple arthrodesis with an option of Achilles lengthening.  *Id.*

On May 2, 2014, Plaintiff saw Dr. Lehnert again.  AR 420-21.  Upon exam, Dr. Lehnert remarked that the talonavicular and subtalar joints "are more tender than they've ever been," although the midfoot was not tender.  AR 421.  On June 6, 2014, Dr. Lehnert wrote to Plaintiff's insurance company, stating that the independent medical review was "ridiculous" since "it was determined that a triple arthrodesis was not indicated despite the QME and my recommendations for such a procedure."  AR 426.  "The bottom line is this guy has a rigid flatfoot that is incredibly painful, such that he is using a cane and a brace without relief of symptoms."  *Id.*  Dr. Lehnert further remarked that Plaintiff had failed anti-inflammatories, a brace, shoegear changes, and a brace.  *Id.*  He noted Plaintiff received significant relief from the injection to the talonavicular joint, but that pain was coming from the subtalar joint, both of which would be fused in the recommended surgery.  AR 426-27.  Physical exam revealed a rigid hindfoot with tenderness to palpation of the talonavicular and subtalar joints, as well as a calcaneal eversion which "is essentially a malunion."  AR 427.

Plaintiff returned to Dr. Lehnert for a follow up visit on August 8, 2014.  AR 442-43.  In his report, Dr. Lehnert remarked that Plaintiff continued to use a cane for ambulation and had a considerable limp.  AR 442.  The physical exam showed ankle joint dorsiflexion was slightly less than 0 degrees with the knee flexed and extended and forefoot to rearfoot relationship was perpendicular.  *Id.*  Dr. Lehnert noted that pain limited some range of motion testing.  *Id.*

6

On August 29, 2014, Dr. Lehnert provided Plaintiff with an orthotic device for his foot. AR 454. At his appointment on September 26, 2014, Plaintiff reported a 20% improvement in his symptoms with the orthotics, although he was still using a cane. AR 458. Physical exam continued to show rigid flatfoot, tenderness to palpation of the subtalar joint and talonavicular joint, eqinus, and nontender midfoot. AR 459. Dr. Lehnert remarked that surgery would still be helpful, but if it could not be approved, an ankle brace – called a "Ritchie brace"– would be helpful. *Id.*

On October 10, 2014, Plaintiff had an x-ray taken of his left foot. AR 467. It did not show any new fracture, but there was evidence of a healed fracture with a deformity at the base of the fourth metatarsal from the prior fracture. *Id.* It also showed very osteopenic bones and pes planus. *Id.*

At his appointment on October 24, 2014, Plaintiff told Dr. Lehnert that although the orthotics initially provided relief, they were starting to fail. AR 479. He had pain across the talonavicular and subtalar joints which was aggravated with activity and relieved with rest. *Id.* It started with tingling in his foot at night. *Id.* Physical exam revealed an "incredibly antalgic gait." AR 480. Plaintiff was still walking with a cane and there was tenderness to palpation of the talonavicular and subtalar joints. *Id.* He had a rigid hindfoot; the midfoot was minimally tender. *Id.*

Plaintiff saw Dr. Lehnert again on November 24, 2014. AR 496-98. Examination revealed a stiff hindfoot, and there was tenderness to palpation of the talonavicular and subtalar joints. AR 496. Dr. Lehnert's diagnosis remained the same: rigid flatfoot valgus following industrial injury. AR 498.

### 3.     2015

Plaintiff continued to see Dr. Lehnert in 2015. On January 30, 2015, Dr. Lehnert noted improved range of motion of the subtalar joint due to use of the Ritchie brace. AR 677. He noted that since Plaintiff had been using the brace, "he has been able to not use the cane." *Id.* Dr. Lehnert stated that if Plaintiff did not show continued improvement in the next month, he would consider a corticosteroid injection to the subtalar joint. *Id.*

During his March 10, 2015 visit, Plaintiff stated he was finding the brace helpful, as was his continued use of the orthotic, but he continued to have pain and was still walking with a cane. AR 530. Examination revealed a stiff subtalar joint but it was relatively nontender. *Id.* Talonavicular joint was very tender as was the second TMT joint. *Id.* Dr. Lehnert again diagnosed hindfoot and midfoot arthrosis and noted that a brace, orthotics, and a cane had failed to eliminate it. *Id.* He decided to administer a corticosteroid injection into the talonavicular and second tarsometatarsal joint in Plaintiff's left ankle, which provided some relief of symptoms. AR 531.

At his next appointment on April 21, 2015, Plaintiff told Dr. Lehnert that he had about three weeks of near complete relief of symptoms. AR 532. Musculoskeletal ultrasound showed some degenerative changes around the talonavicular joint with dorsal osteophytosis. *Id.* Dr. Lehnert administered another injection into the left talonavicular joint. AR 533.

On May 19, 2015, Plaintiff told Dr. Lehnert he had "gotten a little bit better" after the injections. AR 671. Physical exam revealed tenderness to palpation of the talonavicular, lateral margin of the subtalar joint and second TMT joint, with the latter being the least tender. *Id.* Dr. Lehnert's assessment was status post traumatic injury to the left foot which led to a rigid flatfoot and arthrosis of the second TMT joint. AR 671-72. Dr. Lehnert noted that Plaintiff was still ambulating with a cane and using a brace. AR 672.

On June 19, 2015, Plaintiff told Dr. Lehnert that the brace had "helped a little bit" and he received some benefit from the injections, but they were "starting to wear off." AR 669. Physical exam revealed tenderness to palpation of the talonavicular, lateral margin of the subtalar joint, and the second tarsometatarsal joint. *Id.* The hindfoot was more tender than the forefoot. *Id.* Dr. Lehnert's assessment was that Plaintiff had a traumatically induced flatfoot and arthritis across the second TMT joint. *Id.*

Plaintiff saw Dr. Benard again on August 19, 2015. AR 716-21. He told Dr. Benard that his pain had improved somewhat from 8 out of 10 to 6 out of 10. AR 717. He was able to walk two blocks but then had to stop, and he was unable to walk up and down stairs without pain and had difficulty walking on uneven surfaces. *Id.* Plaintiff stated that he also had difficulty with

8

United States District Court
Northern District of California

balance and used a cane. *Id.* He was able to stand for 15 minutes per hour and was able to sit for 45 minutes per hour. *Id.* Vascular examination showed Dorsalis pedis and posterior tibial pulses bilateral +2/4. AR 718. No edema was noted. *Id.* Circumferential measurements of the calves revealed 32.8 cm on the right, compared to 31.5 cm on the left. *Id.* Gait exam showed severe antalgia on the left foot with apropulsive gait noted. *Id.* It was positive for "too many toes sign" on the left. *Id.* The left calcaneus was noted to be a fixed everted position at 5 degrees. *Id.* Ankle joint range of motion was noted to be 5 degrees of dorsiflexion and 45 degrees of plantar flexion on the right, and 10 degrees of dorsiflexion and 45 degrees of plantar flexion on the left. *Id.* Subtalar joint range of motion on the right was 30 degrees of inversion and 20 degrees of eversion. *Id.* Left subtalar joint was noted to be significantly limited with 5 degrees of inversion and 5 degrees of eversion, which was noted to have pain on range of motion. *Id.* First metatarsophalangeal joint range of motion was noted to be 80 degrees of dorsiflexion and 20 degrees of plantar flexion bilateral, which was normal. *Id.* Muscle testing was noted +5/5 on the right with +4/5 on the left, which appeared to be secondary to pain. *Id.* There was pain on palpation over the dorsal and medial aspects of the talonavicular joint. *Id.* There was some pain on inversion and eversion of the subtalar joint left and over the sinus tarsi laterally on the left foot. *Id.*

Based upon his updated review of the records and the exam, Dr. Benard diagnosed Plaintiff with posttraumatic degenerative joint disease, left subtalar joint and midtarsal joint. AR 719. Objective factors he considered were: (1) arthrosis of the left subtalar joint, with a fixed everted position of 5 degrees, (2) left calf atrophy of 1.3 cm. (3) X-ray findings consistent with posttraumatic degenerative changes of the talonavicular joint and subtalar joint left foot, and (4) severe antalgic gait left. AR 719-20.

Plaintiff saw Dr. Lehnert again on October 30, 2015. AR 749-50. Physical exam revealed Plaintiff's subtalar joint was very tender to palpation and equinus appreciated. AR 750. Dr. Lehnert assessed that Plaintiff continued to have a rigid flatfoot with significant discomfort, limping and gait alteration due to his traumatic injury. He found it "interesting" that Plaintiff was told he needed to have conservative care in the form of bracing prior to considering surgery. *Id.*

9

("Now that he has failed bracing, he is being denied surgery. I see no justice in Mr. Plaintiff's case.").

### 4. 2016

Plaintiff continued to see Dr. Lehnert in 2016. In all exams, findings showed a rigid hindfoot with tenderness to palpation around the subtalar and talonavicular joint. AR 729, 731, 735, 737-38, 741-42, 744. The diagnosis also remained the same: traumatic arthritis rigid flatfoot with significant discomfort and equinus. AR 743-44. In the middle of 2016, Plaintiff no longer exhibited the equinus, but the traumatic arthritic flatfoot remained. AR 729, 731, 735, 737-39, 741.

Plaintiff saw Dr. Lehnert on January 29, 2016, during which he complained of pain around the peri-hindfoot area. AR 744-45. Dr. Lehnert noted Plaintiff "is quite limited and he is just trying to get by, by doing some basic things with regards to activities of daily living." *Id.* Measurements taken that day revealed -5 to 10 degrees of dorsiflexion, "which appears worse than it was previously." *Id.* Plaintiff saw Dr. Lehnert again on March 1, 2016, at which time he told Dr. Lehnert that he switches between the brace and the orthotic but that he always uses a cane. AR 742. He also mentioned his foot hurt more when it was cold and that he was using a heating pad on it. *Id.*

On April 4, 2016, Dr. Lehnert noted Plaintiff had continued left ankle symptoms despite brace use and reiterated Plaintiff's complaint that his foot was worse when it was cold. AR 740. At that appointment and the next in May, Dr. Lehnert also reiterated that Plaintiff had significant dysfunction and an antalgic gait and noted he had exhausted conservative options such as bracing, cane, rest, permanent disability, and cortisone injections. AR739, 741.

At his June 3, 2016 appointment, Plaintiff told Dr. Lehnert his foot felt better when the weather became warmer. AR 736. Dr. Lehnert noticed Plaintiff walked with a "considerable limp" at that visit and continued to recommend he have surgery. AR 737. On July 1, 2016, Dr. Lehnert noted Plaintiff was using his cane and orthotics. AR 734. In addition to regular pain, Plaintiff told him he was having flare ups. *Id.* Dr. Lehnert noted Plaintiff was having slight effusion around the subtalar and talonavicular joints. AR 735.

Plaintiff came to his August 30, 2016 appointment with Dr. Lehnert using his cane and orthotics. AR 730. He told Dr. Lehnert his ankle would occasionally swell if he was on it too much. *Id.* Dr. Lehnert stated he would continue to recommend the surgery but that he would look for other treatment options. AR 731. He advised Plaintiff to continue to use the brace, cane or orthotic, whichever was required at the time. *Id.*

The last visit with Dr. Lehnert occurred on September 27, 2016. AR 728-29. At that visit, Plaintiff was continuing to complain of pain and was using his brace. AR 728. Dr. Lehnert continued to recommend he have surgery. AR 729.

### 5. Opinions from Dr. Lehnert

On October 31, 2015, Dr. Lehnert filled out a Physical Medical Source Statement in which he indicated Plaintiff would be restricted to sedentary work. AR 706-07. He also indicated Plaintiff could stand no more than 30 minutes in an eight-hour work day and always needed to use a cane. AR 706. Dr. Lehnert opined Plaintiff could sit with normal breaks for six hours in an eight-hour workday. *Id.* On December 2, 2016, Dr. Lehnert completed another form in which he indicated Plaintiff met Listing 1.02A in the Listing of Impairments, 20 C.F.R. Part 404, Subpt. P, App. 1.[4] AR 762-64. He also stated Plaintiff would have to take unscheduled breaks 1 to 10 times a day for 20 to 30 minutes each. AR 763.

### 6. Opinion from Dr. Benard

On September 21, 2015, Dr. Benard completed a Residual Functional Capacity ("RFC") form.[5] AR 709-13. He opined Plaintiff could only work less than an hour a day and would have to use a cane. AR 709. He would have to keep his left foot elevated for 15 minutes every hour and would have to take unscheduled breaks for 15 minutes every hour. AR 712. Finally, he

---

[4] The Listing of Impairments describes impairments that "would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (emphasis in original). If a claimant's "impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled." *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); 20 C.F.R. § 404.1520(d). The claimant bears the burden of establishing a prima facie case of disability under the Listing of Impairments. *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002); 20 C.F.R. § 404.1520(a)(4)(iii).
[5] As discussed below, RFC refers to what an individual can do in a work setting, despite mental or physical limitations caused by impairments or related symptoms. 20 C.F.R. § 404.1545(a)(1).

opined Plaintiff was capable of performing low stress jobs but would miss more than four days a month due to his impairments.  AR 713.

### 7.    Dr. Elliot Gilpeer

On July 14, 2015, Dr. Elliot Gilpeer reviewed the file and completed an RFC.  AR 71-73. He opined Plaintiff could perform light work in terms of the weight he could carry but that he could only stand and walk four hours out of an eight-hour work day.  AR 72.  Dr. Gilpeer also opined that Plaintiff could sit for about six hours in an eight-hour workday with normal breaks. *Id.*  He further opined Plaintiff was limited in his left lower extremity in that he could not operate foot controls with the left foot.  *Id.*  Dr. Gilpeer limited Plaintiff to only occasionally climbing ramps stairs, balancing, stooping, kneeling, crouching, and crawling and determined he could never climb ladders/ropes/scaffolds.  AR 72-73.  He found no manipulative, visual, communicative, or environmental limitations.  AR 73.

### 8.    Dr. Camille Williams

On November 17, 2015, Dr. B. Camille Williams reviewed the file and affirmed the RFC assessment made by Dr. Gilpeer.  AR 83-84.

## III.    SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On May 4, 2015, Plaintiff filed a claim for Disability Insurance and Supplemental Security Income Benefits, alleging disability beginning on January 24, 2013.  AR 154-55, 161-70.  On July 14, 2015, the Social Security Administration ("SSA") denied Plaintiff's claim, finding Plaintiff did not qualify for disability benefits.  AR 90-93.  Plaintiff subsequently filed a request for reconsideration, which was denied on November 18, 2015.  AR 100-04.  On December 16, 2015, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 106-07.  ALJ Lisa Lunsford conducted a hearing on December 22, 2016.  AR 32-65.  Plaintiff testified in person at the hearing and was represented by counsel, Cynthia Starkey.  The ALJ also heard testimony from Vocational Expert Stephen Davis.

### A.    Plaintiff's Testimony

At the time of his testimony, Plaintiff was elevating his left leg and using a cane.  AR 48-49.  Plaintiff testified that he last worked on January 24, 2013, the date of his accident.  AR 38.  At

that time, he was working as a laborer doing demo work in a computer chip room. AR 39. The work required him to always be on his feet and entailed lifting 70 to 100 pounds. AR 40. Prior to that, he also performed jack hammering work for a couple of months. *Id.* In 2007 and 2008, he worked for a cement company, which also entailed being on his feet most of the day and lifting up to 50 pounds. AR 41-42. Plaintiff also testified about his earlier work, which all involved heavy labor. AR 42-43. He also had experience operating a Bobcat, moving loads of dirt from one area of a construction site to another. AR 43-44.

Plaintiff testified that the pain from his accident is "[a]ll up in my foot and my back," and at the top of his left foot. AR 46. He had pain in his back because he had tools on his back and, when he fell, he fell backward into a plank. AR 47.

Plaintiff testified he did not have surgery because the insurance claim adjuster did not want to pay for it. *Id.* However, he was open to having surgery if it helped him go back to work. AR 47-48. In his current state, Plaintiff testified he could stand 45 minutes, after which he felt tired and in pain. AR 48. He could also sit for 45 minutes. *Id.* He testified he used the cane "all the time" and that he used a brace on his left foot which was like a ski boot. AR 49-50. The brace helped him with his balance and kept his foot from being stiff. AR 50. Plaintiff testified that he was in pain every day and he did not think he could perform a full-time job because his "body is not even in shape to do that." *Id.*

Plaintiff testified that he lived with his mom in Vallejo and on a typical day, he would just lie on the couch and watch television with her. AR 50-51. He testified that the "most comfortable" position for him at home is "laying on the couch, propped up." AR 50. He did not perform any household chores and felt he could not drive because of the pain. AR 51-52.

## B.    Vocational Expert's Testimony

The vocational expert summarized Plaintiff's past work as a construction laborer, DOT[6]

_____

[6] The Dictionary of Occupational Titles ("DOT") by the United States Department of Labor, Employment & Training Administration, may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The DOT classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d) (1). The "best source for how a job is generally performed is usually the Dictionary of Occupational

869.687-026, and jackhammer operator, DOT 930.684-018.  AR 54-55.  The ALJ gave the vocational expert a hypothetical question which included the following limitations: an RFC for sedentary work except no work with foot controls using the left foot, no climbing ladders, ropes, scaffolds, no kneeling, crouching or crawling.  The person could occasionally climb ramps/stairs, balance and stoop.  A cane would be required for the non-dominant hand for all walking and standing.  Standing and walking would be limited to 30 minutes a day.  He could never be exposed to heights or moving machinery.  AR 55-57.  In response, the vocational expert indicated Plaintiff could perform the jobs of Order Clerk, Food and Beverage, DOT 209.567-014; Assembler, DOT 734.687-018; and Table Worker, DOT 739.687-182.  *Id.*

## C.    ALJ's Decision and Plaintiff's Appeal

On February 23, 2017, the ALJ issued an unfavorable decision finding Plaintiff was not disabled.  AR 13-27.  This decision became final when the Appeals Council declined to review it on March 20, 2018.  AR 1-6.  Having exhausted all administrative remedies, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).  On January 15, 2019, Plaintiff filed the present Motion for Summary Judgment.  On February 20, 2019, Defendant filed a Cross-Motion for Summary Judgment.

## IV.    STANDARD OF REVIEW

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g).  The ALJ's decision must be affirmed if the findings are "supported by substantial evidence and if the [ALJ] applied the correct legal standards."  *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted).  "Substantial evidence means more than a scintilla but less than a preponderance" of evidence that "a reasonable person might accept as adequate to support a conclusion."  *Thomas*, 278 F.3d at 954 (quoting *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)).  The court must consider the administrative record as a whole, weighing the evidence that both supports and detracts from the ALJ's conclusion.  *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).  However, "where the

Titles."  *Pinto v. Massanari*, 249 F.3d 840, 846 (9th Cir. 2001).

1    evidence is susceptible to more than one rational interpretation," the court must uphold the ALJ's

2    decision. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). Determinations of credibility,

3    resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the

4    ALJ. *Id.*

5        Additionally, the harmless error rule applies where substantial evidence otherwise supports

6    the ALJ's decision. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). "[A]n error is

7    harmless so long as there remains substantial evidence supporting the ALJ's decision and the error

8    'does not negate the validity of the ALJ's ultimate conclusion.'" *Id.* (quoting *Batson v. Comm'r of*

9    *Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004)). A court may not reverse an ALJ's

10   decision because of an error that is harmless. *Id.* at 1111 (citing *Stout v. Comm'r, Soc. Sec.*

11   *Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006)). "'[T]he burden of showing that an error is

12   harmful normally falls upon the party attacking the agency's determination.'" *Id.* (quoting

13   *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).

## V.    DISCUSSION

### A.    Framework for Determining Whether a Claimant Is Disabled

16       The regulations promulgated by the Commissioner of Social Security provide for a five-

17   step sequential analysis to determine whether a Social Security claimant is disabled.[7] 20 C.F.R. §

18   404.1520. The sequential inquiry is terminated when "a question is answered affirmatively or

19   negatively in such a way that a decision can be made that a claimant is or is not disabled." *Pitzer*

20   *v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990). During the first four steps of this sequential

21   inquiry, the claimant bears the burden of proof to demonstrate disability. *Valentine v. Comm'r*

22   *Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009). At step five, the burden shifts to the

23   Commissioner "to show that the claimant can do other kinds of work." *Id.* (quoting *Embrey v.*

24   *Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

25       The ALJ must first determine whether the claimant is performing "substantial gainful

26

27   _____

28   [7] Disability is "the inability to engage in any substantial gainful activity" because of a medical
     impairment which can result in death or "which has lasted or can be expected to last for a
     continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

United States District Court
Northern District of California

activity," which would mandate that the claimant be found not disabled regardless of medical condition, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(i), (b). Here, the ALJ determined Plaintiff had not performed substantial gainful activity since January 24, 2013. AR 18.

At step two, the ALJ must determine, based on medical findings, whether the claimant has a "severe" impairment or combination of impairments as defined by the Social Security Act. 20 C.F.R. § 404.1520(a)(4)(ii). If no severe impairment is found, the claimant is not disabled. 20 C.F.R. § 404.1520(c). Here, the ALJ determined Plaintiff had the following severe impairments: left foot post-traumatic degenerative joint disease, arthrosis, and rigid flatfoot. AR 18.

If the ALJ determines that the claimant has a severe impairment, the process proceeds to the third step, where the ALJ must determine whether the claimant has an impairment or combination of impairments that meet or equals an impairment listed in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment either meets the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is conclusively presumed to be disabled, without considering age, education and work experience. 20 C.F.R. § 404.1520(d). Here, the ALJ determined Plaintiff did not have an impairment or combination of impairments that meets the listings. AR 19. The ALJ determined Plaintiff's left foot post-traumatic degenerative joint disease, arthrosis, and rigid flatfoot do not meet Listing 1.02 "because there is no evidence that the claimant is unable to ambulate effectively as defined in the listing." *Id.*

Before proceeding to step four, the ALJ must determine the claimant's RFC. 20 C.F.R. § 404.1520(e). RFC refers to what an individual can do in a work setting, despite mental or physical limitations caused by impairments or related symptoms. 20 C.F.R. § 404.1545(a)(1). In assessing an individual's RFC, the ALJ must consider all the claimant's medically determinable impairments, including the medically determinable impairments that are nonsevere. 20 C.F.R. § 404.1545(e). Here, the ALJ determined Plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a), with limitations:

> he cannot use foot controls with the left lower extremity. He can never climb ladders, ropes, or scaffolds, kneel, crouch, and crawl. He can occasionally climb ramps/stairs, balance, and stoop. He requires

16

the use of a cane in the non-dominant hand for all walking and standing. Standing and walking is limited to 30 minutes total during the workday. He can never be exposed to heights or moving machinery.

AR 19.

The fourth step of the evaluation process requires that the ALJ determine whether the claimant's RFC is sufficient to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1520(f). Past relevant work is work performed within the past 15 years that was substantial gainful activity, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1). If the claimant has the RFC to do his past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4) (iv). Here, the ALJ determined Plaintiff is unable to perform any past relevant work. AR 25.

In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there are other jobs existing in significant numbers in the national economy which the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g); 404.1560(c). The Commissioner can meet this burden by relying on the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, Subpt. P, App. 2. *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006). Here, the ALJ determined there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. AR 25. Specifically, the ALJ determined Plaintiff would be able to perform the requirements of representative occupations such as Assembler, DOT 734.687-018; and Table Worker, DOT 739.687-182, SVP 2. AR 26. As such, the ALJ determined Plaintiff had not been under a disability since January 24, 2013, the alleged onset date. *Id.*

**B.  Plaintiff's Arguments**

Plaintiff raises four arguments in support of his motion: (1) the ALJ erred in failing to find he met Listing 1.02A; (2) the ALJ erred by giving little weight to Dr. Lehnert's opinion and by giving great weight to the other physicians of record; (3) the ALJ erred in determining Plaintiff was not credible; and (4) the ALJ erred in determining he could perform a range of sedentary work. Mot. at 14.

**C.    Listing 1.02A**

Plaintiff first contends the ALJ erred in failing to find he met Listing 1.02A, which covers a disability based on a major dysfunction of a joint.  Pl.'s Mot. at 14; 20 C.F.R. Pt. 404, Subpt. P, App. 1. § 1.02.  Plaintiff argues there is sufficient evidence to show he meets the requirements of Listing 1.02A because "[t]he record is complete of many examples of . . . not being able to effectively ambulate," including that he was prescribed a walking boot and used a crutch immediately after his injury; Dr. Lehnert noted he was walking with a cane and had a distinct limp in December 6, 2013; he told Dr. Benard in March 2014 that he had difficulty walking up and down stairs and on uneven surfaces; in June 2014, Dr. Lehnert wrote in his notes that Plaintiff had a rigid flatfoot, "that is incredibly painful, such that he is using a cane and a brace without relief of symptoms"; in August 2014, Dr. Lehnert remarked that Plaintiff used a cane for ambulation and walked with a considerable limp; in August 2015,  Dr. Benard noted Plaintiff reported he was unable to walk up and down stairs without pain, had difficulty walking on uneven surfaces and had difficulty with balance; and after he received orthotics and a brace, Dr. Lehnert's notes mentioned Plaintiff was continuing to have pain and difficulty walking whether it was with the cane, orthotics, brace or all three.  Pl.'s Mot. at 16-17.  Plaintiff argues this record establishes that he had difficulty in ambulation and the ALJ therefore erred in finding he did not meet Listing 1.02A.  *Id.* at 17.

In response, Defendant argues the medical evidence supported the ALJ's step three finding because Plaintiff did not satisfy the regulatory definition of "inability to ambulate effectively." Def.'s Mot. at 2.

**1.    Legal Standard**

As noted above, at step three in the sequential process, an ALJ must consider whether a claimant's conditions meet or equal any of the impairments outlined in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii).  The listings describe impairments that "would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity." *Sullivan*, 493 U.S. at 532 (emphasis in original).  If a claimant's "impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled."  *Bowen*, 482 U.S.

18

United States District Court
Northern District of California

at 141; *see also* 20 C.F.R. § 404.1520(d). The claimant bears the burden of establishing a prima facie case of disability under the listings. *See Thomas*, 278 F.3d at 955; *see also* 20 C.F.R. § 404.1520(a)(4)(iii).

An impairment meets a listing when all the medical criteria required of that listing is satisfied. 20 C.F.R. § 404.1525(c)(3); *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999) ("To meet a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim."). "To equal a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment. . . ." *Id.* at 1099 (quoting 20 C.F.R. § 404.1526(a)).

"If a claimant suffers from multiple impairments and none of them individually meets or equals a listed impairment, the collective symptoms, signs and laboratory findings of all of the claimant's impairments will be evaluated to determine whether they meet or equal the characteristics of any relevant listed impairment." *Id.* (citing 20 C.F.R. § 404.1526(a)). However, "'[m]edical equivalence must be based on medical findings," and "[a] generalized assertion of functional problems is not enough to establish disability at step three.'" *Id.* at 1100 (quoting 20 C.F.R. § 404.1526(a)).

### 2. Analysis

While a review of the record leaves no doubt Plaintiff experiences symptoms in his left lower extremity that affect his ability to walk, the Court's review focuses on whether he has established a disability under the listings. *See Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability."). Thus, Plaintiff cannot meet a listing based solely on the diagnosis of a listed impairment; rather, he "must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525(d). Here, the record does not support such a conclusion.

The ALJ found that Plaintiff's impairments "[did] not meet or medically equal Listing 1.02 . . . because there is no evidence that [he] is unable to ambulate effectively as defined in the listing." AR 19. Under the listings, major dysfunction of a joint is described as follows:

Characterized by gross anatomical deformity (e.g., subluxation,

contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

Listing 1.00B2b in turn provides as follows:

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.*

Turning to the evidence Plaintiff cites in support of his motion, the record shows he used a cane for ambulation, walked with antalgic gait, wore a brace, reported to providers that he could not walk up and down stairs or on uneven surfaces, and suffered considerable pain as a result of his injury. *See, e.g.,* AR 321, 408, 412, 426, 442, 458, 480, 531, 564, 653, 655, 672, 717, 720, 728, 730, 742. However, this does not satisfy the regulatory definition of an inability to ambulate effectively. First, Plaintiff has failed to show he has "insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the

20

functioning of both upper extremities," i.e., using "a walker, two crutches or two canes." *See* Listings §§ 1.00B2b1, 1.00B2b2, 1.00J. As explained further in Listing 1.00J, what makes impaired ambulation extreme enough to be per se disabling is the impact on the individual's ability to use both of his upper extremities while ambulating. Specifically, an individual using "a hand-held assistive device(s) that limits the functioning of both upper extremities" cannot—while in the act of ambulating—use his extremities for other kinds of work-related activities, such "as lifting, carrying, pushing, and pulling." *See* Listing § 1.00B2b1, referencing Listing § 1.00J4 ("The requirement to use a hand-held assistive device may also impact on the individual's functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling").

While there is evidence that Plaintiff used a cane and a brace (AR 663, 709, 715, 731, 760), there is no evidence indicating he required two canes or a walker.[8] Indeed, the ALJ incorporated into the RFC that Plaintiff "require[d] the use of a cane in the non-dominant hand for all walking and standing." AR 19, 23 (giving "great weight" to opinion that Plaintiff required a cane). There is no evidence showing Plaintiff lacked the ability to perform the minimal lifting and carrying involved with sedentary work, i.e., lifting files and small items of no more than 10 pounds at a time, with one hand. *See* 20 C.F.R. § 404.1567(a). Thus, using one cane is not per se disabling under the listings. *See* AR 706-07 (Dr. Lehnert opined Plaintiff could occasionally lift 10 pounds, had "only [a] foot injury," and no upper extremity impairment). Because use of a single cane is not a listing-level limitation (nor is a limp or antalgic gait sufficient for a listing), Plaintiff does not satisfy the regulatory definition of "inability to effectively ambulate" under Listing § 1.00B2b1.

Second, Plaintiff fails to establish any other limitation under Listing 1.00B2b. In his Reply, Plaintiff cites to *Nester v. Comm'r of Social Sec. Admin.*, 2012 WL 468254, at *7 (E.D. Cal. Feb. 13, 2012) in support of his argument that he can meet the listing in ways other than showing he needs a hand-held assistive device that limits the functioning of both upper

_____

[8] Plaintiff used crutches in the months following his injury in January 2013 but was using a cane by August 2013. *See* AR 311, 616, 663.

extremities.  Reply at 3, ECF No. 30.  The Court agrees that other limitations – separate and apart from needing to use two-handed assistive devices – can meet the definition of "ineffective ambulation."  *See* 20 C.F.R. pt. 404, subpt. P, App. 1, § 1.00(B)(2)(b).  However, Plaintiff fails to show he meets them as well.

Plaintiff generally asserts he has "difficulty walking up and down stairs and on uneven surfaces."  Pl.'s Mot. at 16-17 (citing AR 408, 717).  But Listing 1.00B2b2 refers to "the *inability* to walk a block at a reasonable pace on rough or uneven surfaces" (emphasis added).  Plaintiff's cited evidence speaks to *difficulty* walking uneven surfaces generally.  AR 408, 717.  Further, the Listing's introductory instructions expressly differentiate between "a report of the individual's allegation" made during a physical examination and the "testing methods . . . used to verify" any "abnormal findings."  *See* Listing § 1.00D ("These physical findings must be determined on the basis of objective observation during the examination and not simply a report of the individual's allegation; e.g., 'He says his leg is weak, numb.'  Alternative testing methods should be used to verify the abnormal findings . . .").  Plaintiff notes Dr. Lehnert sent him "out for a brief walk" and he returned 20 minutes later "hobbling" in pain.  Pl.'s Mot. at 16 (citing AR 653).  But there is no evidence that he could not walk even a block at a reasonable pace on rough or uneven surfaces.  And during the same visit, Dr. Lehnert gave Plaintiff a lidocaine injection into the left foot and, within five minutes of the injection, Plaintiff's foot "was more than 95 percent pain free."  AR 653.  As such, Plaintiff's self-reports of generalized difficulties are also insufficient to meet the listing.

Similarly, the listing language cited by Plaintiff notably refers to the "*inability* to climb a few steps at a reasonable pace with the use of a single hand rail."  Listing § 1.00B2b2 (emphasis added).  Under this listing, an inability to ascend just a few steps, even with the assistance of a handrail, is the kind of extreme limitation that would be per se disabling under the listing, but the record establishes only that Plaintiff has "difficulty" walking up and down stairs without pain, without reference to whether he uses a handrail.  AR 717, 723.

Finally, Plaintiff asserts that the ALJ's finding is "just a conclusion" and that the ALJ did not discuss any "evidence or what the Listing required."  Pl.'s Mot. at 14.  However, "[i]t is

unnecessary to require the [ALJ], as a matter of law, to state why a claimant failed to satisfy every different section of the listing," and an ALJ provides more than sufficient analysis to support a step three finding by "includ[ing] a statement of subordinate factual foundations on which the ultimate factual conclusions [were] based." *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200-01 (9th Cir. 1990) (citation omitted) (an "evaluation of evidence" including summaries of information from each doctor and plaintiff's testimony was an "adequate statement"); *see also Lewis v. Apfel*, 236 F.3d 503, 513-14 (9th Cir. 2001) (finding that the ALJ "discussed and evaluated the evidence" that claimant did not meet a listing, even though that discussion did not take place "under the heading 'Findings'"). Here, in formulating Plaintiff's RFC, the ALJ's decision includes a discussion and evaluation of the medical evidence relating to Plaintiff's impairments that spans nearly five pages. AR 20-25. The fact that this discussion did not occur under Finding no. 4 (addressing step three) does not detract from its sufficiency. *See Lewis*, 236 F.3d at 513-14. More importantly, the ALJ identified a specific reason that Plaintiff did not meet Listing 1.02 – there was no evidence he was unable to ambulate effectively as defined in the listing. AR 19. Because she found Plaintiff failed to meet this requirement, the ALJ was not required to address the remaining listing requirements. *Gonzalez*, 914 F.2d at 1200–01.

In sum, while Plaintiff's impairment might meet some of the specified criteria for Listing 1.02, there is no evidence that he meets all the criteria. This was his burden to prove, and the ALJ provided a clear and explicit reason for why the listing was not met. *See Sullivan*, 493 U.S. at 530 ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.") (emphasis in original); *Kennedy v. Colvin*, 738 F.3d 1172, 1176 (9th Cir. 2013) ("Listed impairments are purposely set at a high level of severity because 'the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary.'"). As such, the Court finds the ALJ's determination that Plaintiff's impairments did not meet or equal a listed impairment was supported by substantial evidence in the record as a whole, and it must therefore be upheld.

**D.      Medical Opinions[9]**

Plaintiff next argues the ALJ erred by giving little weight to his treating and examining physicians, Drs. Lehnert and Benard, and by giving great weight to the other physicians in the record.  Pl.'s Mot. at 21.  He maintains "the ALJ is cherry picking through the evidence" and "ignored the evidence favorable to a finding of disability."  *Id.*  Defendant argues Plaintiff's "subjective disagreement with the ALJ's assessment of the medical evidence and her conclusions regarding medical opinions does not constitute reversible error," and to the extent the ALJ rejected certain portions of Dr. Lehnert's and Dr. Benard's opinions, "such rejection was proper and supported by substantial evidence."  Def.'s Mot. at 7.

**1.      Legal Standard**

When determining whether a claimant is disabled, the ALJ must consider each medical opinion in the record together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *King v. Berryhill*, 2018 WL 4586726, at *11 (N.D. Cal. Sept. 25, 2018).  In deciding how much weight to give to any medical opinion, the ALJ considers the extent to which the medical source presents relevant evidence to support the opinion.  20 C.F.R. § 416.927(c)(3).  Generally, more weight will be given to an opinion that is supported by medical signs and laboratory findings, and the degree to which the opinion provides supporting explanations and is consistent with the record as a whole.  20 C.F.R. § 416.927(c)(3)-(4).

In conjunction with the relevant regulations, the Ninth Circuit "developed standards that guide [the] analysis of an ALJ's weighing of medical evidence."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527).  Courts "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830

_____

[9] Rules regarding the evaluation of medical opinion evidence were recently updated, but the updates were made effective only for claims filed on or after March 27, 2017.  *See* 82 Fed. Reg. 5844 (Jan. 18, 2017).  As Plaintiff's claim was filed on May 4, 2015, the Court evaluates the medical opinion evidence in his case under the older framework as set forth in 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) and in Social Security Ruling 96-2p.

(9th Cir. 1995). "By rule, the Social Security Administration [SSA] favors the opinion of a treating physician over non-treating physicians." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527). If a claimant has a treatment relationship with a provider, and clinical evidence supports that provider's opinion and is consistent with the record, the provider will be given controlling weight. 20 C.F.R. § 416.927(c)(2). "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [SSA] considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii)).

> Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the [Social Security] Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record.

*Id.* (citing 20 C.F.R. § 404.1527(d)(3)-(6)). Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference. *See id.* at 632 (citing SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996)).[10] "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p at *4.

---

[10] "[Social Security Rulings] do not carry the force of law, but they are binding on ALJs nonetheless." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see* 20 C.F.R. § 402.35(b)(1). The Ninth Circuit defers to the rulings unless they are "plainly erroneous or inconsistent with the Act or regulations." *Chavez v. Dep't of Health and Human Serv.*, 103 F.3d 849, 851 (9th Cir. 1996).

2.      **Analysis**

        a.      **Dr. Lehnert**

There is no dispute that Dr. Lehnert is Plaintiff's treating physician.  Pl.'s Mot. at 21;

Def.'s Mot. at 7-8.  Dr. Lehnert provided multiple assessments regarding Plaintiff's functional

limitations, which the ALJ analyzed and assigned "differing" levels of weight depending on how

well the record supported them.  AR 22-23.  The ALJ gave "great weight" to Dr. Lehnert's

opinions that Plaintiff could not return to his work as a laborer, could not perform light work, and

was restricted to sedentary work.  AR 22 (citing AR 574, 621, 659, 737, 741).  Likewise, the ALJ

gave great weight to Dr. Lehnert's opinion that Plaintiff could: lift/carry 10 pounds occasionally;

stand and/or walk for 30 minutes in a workday; sit for six hours in a workday with normal breaks;

and always required a cane.  AR 23 (citing AR 706-07).  The ALJ explained that the opinions

given great weight assessed restrictions that were reasonable in light of Plaintiff's injury and

"consistent with the treatment records."  AR 22-23; *see* 20 C.F.R. § 404.1527(c)(4) ("Generally,

the more consistent a medical opinion is with the record as a whole, the more weight we will give

to that medical opinion.").

Plaintiff does not dispute these findings.  Instead, he argues the ALJ erred in rejecting Dr.

Lehnert's opinions that he would need unscheduled breaks and that he met Listing 1.02A.  Pl.'s

Mot. at 21.  Plaintiff argues Dr. Lehnert's opinions are based upon his treatment history and well-

supported in the record.  *Id.*  He notes Dr. Lehnert based his opinion on his reading of the 2013 x-

ray showing a left foot fracture of 2nd – 4th metatarsals, the left foot MRI taken on September 5,

2013 showing degenerative or posttraumatic changes and a deformed subtalar joint, and that in

almost every appointment Dr. Lehnert noted Plaintiff walked with a limp or had an antalgic gait.

*Id.* (citing AR 312, 319, 653, 666).  He also argues Dr. Lehnert's opinion was consistent with Dr.

Benard's opinion, the only other physician to have examined him.  *Id.* at 22.

In the Ninth Circuit, an ALJ need only provide specific and legitimate reasons for

discounting a contradicted treating physician's opinion.  *Tommasetti v. Astrue*, 533 F.3d 1035,

1041 (9th Cir. 2008) (ALJ "complied with *Magallanes* and provided specific and legitimate

reasons for rejecting [the treating doctor's] opinion"); *Magallanes*, 881 F.2d at 751 (an ALJ

sufficiently discounts a contradicted treating opinion by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings") (citation omitted). Here, the Court finds the ALJ gave specific and legitimate reasons for giving certain opinions of Dr. Lehnert little weight and substantial evidence in the record supports her reasoning. As to unscheduled breaks, the ALJ noted this requirement "is not supported by the record or adequately explained." AR 23. As to Listing 1.02A, the ALJ noted Dr. Lehnert failed to provide any rationale for how Plaintiff's condition met the listing's requirements. *Id.*

As part of her decision, the ALJ noted that Dr. Lehnert's opinion contained internal inconsistencies, including that he opined Plaintiff "could sit six hours in an eight-hour workday with normal breaks but then limited [him] to sitting less than two hours." *Id.* (citing AR 762-65). In a December 2, 2016 opinion, Dr. Lehnert confirmed his prior opinion that Plaintiff could "sit with normal breaks" for six hours in a workday. AR 763; *see* AR 706-07 (prior opinion). Dr. Lehnert then opined that Plaintiff could sit for less than two hours, stand/walk for less than two hours, and would need to take one to ten unscheduled breaks (20-30 minutes each) during a workday. AR 763. An inconsistent medical opinion is a proper reason to give an opinion less weight. 20 C.F.R. § 404.1527(c)(4); *Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992) (internal inconsistencies and ambiguities within doctor's opinion provided specific and legitimate reasons for ALJ to reject opinion); *Morgan*, 169 F.3d at 602 (inconsistency between two doctor's conclusions regarding claimant's mental functioning "provided the ALJ additional justification for rejecting" one of the conclusions). When presented with two contradictory statements, the ALJ is entitled to accept one over the other. *See Tommasetti*, 533 F.3d at 1041 ("the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence"). As Dr. Lehnert had twice opined that Plaintiff could sit for up to six hours with normal breaks (AR 706, 763), the Court finds the ALJ properly relied on that opinion and reasonably rejected the inconsistent opinion that he could only sit for less than two hours. *See Johnson v. Shalala*, 60 F.3d 1428, 1433 (9th Cir. 1995) (doctor's opinion may be discounted or rejected if it is self-contradictory); *Matney*, 981 F.2d at 1020; *Valentine*, 574 F.3d at 692-93 (contradiction between treating physician's opinion

and his treatment notes constitutes a specific and legitimate reason for rejecting treating physician's opinion); *Tommasetti*, 533 F.3d at 1041 (incongruity between medical records and opinion provided a specific and legitimate reason for rejecting treating physician's opinion); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ permissibly rejected treating physician's opinion when opinion was contradicted by or inconsistent with treatment reports).

While Plaintiff focuses on Dr. Lehnert's overall opinion as being supported by the record "based upon his treatment history," the issue here is whether the record supports Dr. Lehnert's opinions that the ALJ gave little weight and whether Dr. Lehnert adequately explained how he reached those opinions. An "ALJ need not accept an opinion of a physician—even a treating physician—if it is conclusionary and brief and is unsupported by clinical findings." *Matney*, 981 F.2d at 1019. While Dr. Lehnert opined that Plaintiff needed up to ten unscheduled breaks per day, AR 763, he proffered no explanation for why so many breaks were necessary. Plaintiff argues that it is due to his "slow pace and pain" and refers to his own report of "significant difficulty" with his daily activities, the instance where he was "hobbling" after walking for 20 minutes at Dr. Lehnert's office, and that the doctor had stated at various times that Plaintiff "failed" a brace, orthotics, and cane, and was generally in a lot of pain. Pl.'s Mot. at 21-22 (citing AR 426, 530, 653). There is no dispute that Plaintiff reported pain and discomfort symptoms to Dr. Lehnert during visits; however, neither the cited records nor the treatment notes show he needed ten unscheduled breaks to accomplish daily activities, nor that pain disrupted his ability to accomplish tasks with such frequency to support this opinion. Thus, the ALJ reasonably found that Dr. Lehnert's opinion regarding breaks was unsupported and inadequately explained. *See* 20 C.F.R. §§ 404.1527(c)(3), (c)(4) (more weight afforded to medical opinions that provide supporting explanations and that are consistent with the record as a whole); *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (treating doctor's opinion properly rejected when treatment notes "provide no basis for the functional restrictions he opined should be imposed on [claimant]").

Likewise, the ALJ correctly noted that Dr. Lehnert provided "[n]o rationale" for why Plaintiff met Listing 1.02A. AR 23, 763-64. Dr. Lehnert's notation of "stiff fibrous/ankylosed

hindfoot" provides no meaningful assistance as to why Plaintiff meets all the requirements of the listing. Indeed, it does not address any "signs of limitation of motion or other abnormal motion of the affected joint(s)," *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, nor does it discuss any imaging findings or speak to any resultant inability to effectively ambulate per the regulatory definition— which, as discussed above, are separate requirements of the listing. An ALJ properly rejects such an opinion that is unsupported and conclusory. *See Matney*, 981 F.2d at 1019.

In sum, the Court finds the ALJ properly gave reduced weight to Dr. Lehnert's opinions regarding unscheduled breaks and meeting Listing 1.02A, while appropriately giving "great weight" to his other opinions regarding his abilities to sit, stand/walk for 30 minutes in a workday, and generally that Plaintiff could perform sedentary work. An ALJ sufficiently discounts a contradicted treating opinion by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751 (citation omitted). While Plaintiff may contend the evidence is more "susceptible" to his interpretation of the record, the Court "must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina*, 674 F.3d at 1111; *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the [ALJ's] conclusion, the court may not substitute its judgment for that of the [ALJ].").  Accordingly, the ALJ's decision must be affirmed.

### b. Dr. Benard

Plaintiff saw Dr. Benard for a qualified medical evaluation and re-evaluation as part of his workers' compensation case. AR 378, 407, 716, 722. The ALJ assigned "great weight" to Dr. Benard's opinion that Plaintiff could not return to his occupation as a laborer "because this is consistent with the objective medical evidence and clinical findings." AR 24 (citing AR 721). However, Dr. Benard also opined that Plaintiff required a cane, could work for less than one hour per day, and could sit, stand, walk, and drive for less than one hour each in a workday. AR 709. The ALJ gave "little weight" to this portion of his opinion, finding it was not "supported by the medical evidence as a whole" and "extremely restrictive without adequate explanation." AR 24. The ALJ noted Dr. Benard's failure to explain why Plaintiff—whose primary condition stemmed

United States District Court
Northern District of California

from a foot injury—could only work for less than one hour per day. *Id.*

Plaintiff argues that contrary to the ALJ's decision, "Dr. Benard's opinion is the most detailed of any opinion in the record." Pl.'s Mot. at 22. He notes Dr. Benard is the only physician who conducted extensive measurements regarding his ankle function and his opinion "takes into account the objective medical evidence, examinations and review of records." *Id.* at 22-23. Plaintiff argues that, "[g]iven the pain [he] was experiencing [and] the medical findings, it [was] reasonable to conclude that [he] could only work less than one hour a day in a competitive work environment." *Id.* at 23. Plaintiff also argues the ALJ should have given his opinion more weight "as he is a specialist in the field." *Id.* n.5.

In evaluating the opinion of an examining source, an ALJ considers the same factors under 20 C.F.R. § 404.1527(c) as it does when evaluating a treating physician's opinion, including whether there is evidence supporting the opinion, whether it is consistent with the record as a whole, and any other factors relevant to weighing the opinion. 20 C.F.R. §§ 404.1527(c)(3), (c)(4), (c)(6). Here, the Court finds the ALJ reasonably rejected Dr. Benard's opinion that Plaintiff could work for less than one hour per day. Plaintiff's complaints of pain focused largely on pain from walking distances, stairs, or on uneven surfaces. AR 408, 717. Even after he started using a brace, his primary complaints of difficulties stemmed from pain from walking. AR 717. He did not complain to Dr. Benard about difficulties sitting or the need to constantly get up during prolonged sitting. Despite this, Dr. Benard opined Plaintiff could not work for one hour in a day, even if he were sitting. AR 709. Such inconsistency between the medical records and Dr. Benard's opinion is a valid reason to reject his opinion. *See Tommasetti*, 533 F.3d at 1041 (after discussing the claimant's medical history and treatments in detail, the ALJ properly found an "incongruity" between the doctor's questionnaire responses and her medical records because the doctor's conclusions regarding the extent of claimant's ability to stand and sit and his need for breaks "did not mesh with her objective data or history").

Plaintiff also argues Dr. Benard's opinion should have been afforded more weight because he is a specialist. Pl.'s Mot. at 23 n.5. Specialization is a relevant consideration. *See* 20 C.F.R. § 416.927(c)(5) ("We generally give more weight to the medical opinion of a specialist about

medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."). However, it does not override all other considerations, such as whether the physician supports the opinion with relevant evidence or whether the opinion is consistent with the record as a whole. *Id.* §§ 416.927(c)(3), (c)(4). Regardless, the ALJ gave "great weight" to portions of Dr. Bernard's opinion, but only reduced weight to his opinion that was not supported by the medical evidence as a whole.

In sum, the Court finds the ALJ's decision to reject Dr. Benard's opinion was reasonable and well-supported. And even "[i]f the evidence can reasonably support either affirming or reversing the [ALJ's] conclusion, the court may not substitute its judgment for that of the [ALJ]." *Flaten*, 44 F.3d at 1457 (citation omitted); *Molina*, 674 F.3d at 1111 ("Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record"). Accordingly, the ALJ's decision must be affirmed.

### c. Dr. Sharma,

Dr. Sharma opined on January 30, 2013 that Plaintiff was on temporary total disability (AR 321), but subsequently determined he could return to modified, mostly seated work on February 1, 2013 (AR 349), seated work only on March 27, 2013 (AR 355), and return to full duty on June 24, 2013 (AR 356). The ALJ gave "little weight" to Dr. Sharma's assessment that Plaintiff could return to full duty, finding it was not supported by the medical records, but otherwise gave "great weight" to Dr. Sharma's opinion that Plaintiff could perform sedentary work "because it is related to his specialty, consistent with the clinical findings, and supported by the objective medical evidence." AR 23.

Plaintiff argues Dr. Sharma's opinion is entitled to "no" weight because Dr. Sharma referred to fractures at the second and either the third or fifth metatarsal, whereas the evidence indicated the fractures occurred at the second and fourth metatarsals. Pl.'s Mot. at 23-24 (citing AR 319, 321, 356). It is true that Dr. Sharma's opinion is inconsistent regarding the location of the fracture. *Compare* AR 319, 321. However, there is no indication that the precise location of the fractures affected Dr. Sharma's opinion. Whether the second fracture occurred at the third,

fourth, or fifth metatarsal, Dr. Sharma assessed that the fractures healed and Plaintiff could therefore return to some form of work status.  AR 350, 355-56.  Drs. Lehnert and Benard also assessed that the fractures healed.  AR 409, 664.  Plaintiff's argument that Dr. Sharma's opinion should be rejected based on an inconsequential error is without merit.

Plaintiff also argues Dr. Sharma's opinion deserves less weight because the examinations occurred in 2013, yet his hearing was not until 2016.  Pl.'s Mot. at 24.  However, the ALJ gave great weight to Dr. Sharma's assessment that Plaintiff could perform sedentary work because Dr. Sharma was a specialist and the opinion was consistent with other evidence in the record.  AR 23. Further, like Dr. Sharma, Dr. Lehnert opined on multiple occasions that Plaintiff could perform sedentary work, including as early as 2013.  AR 574, 621, 659, 737, 741.  Plaintiff did not challenge the ALJ's decision to give Dr. Lehnert's opinion regarding sedentary work great weight, so it is unclear why he now argues the ALJ should not have afforded Dr. Sharma's consistent opinion the same weight.  Regardless, Plaintiff provides no authority for why Dr. Sharma's opinion is entitled to no weight simply because the examinations occurred in 2013.  Accordingly, the ALJ's decision must be affirmed.

### d.    Drs. Gilpeer and Williams

Plaintiff also argues the ALJ erred in assigning "partial weight" to State agency medical consultants Drs. Gilpeer and Williams.  Pl.'s Mot. at 24.  Dr. Gilpeer opined Plaintiff could perform light work in terms of the weight he could carry but that he could only stand and walk four hours out of an eight-hour work day, could sit for about six hours in an eight-hour workday with normal breaks, and that he was limited in his left lower extremity in that he could not operate foot controls with the left foot.  AR 72.  Dr. Williams subsequently reviewed the file and affirmed Dr. Gilpeer's RFC.  AR 83-84.  In deciding to give their opinions partial weight, the ALJ found them generally consistent with the record and clinical findings, but gave "less weight" to the determination that Plaintiff could stand/walk for four hours "because this is inconsistent with the objective findings noted on examination as well as the radiology studies."  AR 22.

Plaintiff argues Drs. Gilpeer's and Williams's opinions "were entitled to no weight."  Pl.'s Mot. at 24.  His sole argument is that "Dr. Gilper [sic] is not a doctor of podiatry or an orthopedic

surgeon.  Dr. Williams is an otolaryngologist.  It is a waste of taxpayer money to have doctors

review these files when they are not familiar with the area of the body that is injured."  *Id.*

Plaintiff provides no authority in support of this argument.  Regardless, per the regulations, State

agency medical consultants are considered "highly qualified physicians . . . who are also experts in

Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i).[11]  These regulations are

entitled to deference.  *Barnhart v. Walton*, 535 U.S. 212, 222 (2002).  Thus, the Court finds the

ALJ is entitled to rely on these expert opinions, regardless of Plaintiff's views on how to "better"

utilize taxpayer money in the disability determination process.  And, having made only superficial

challenges as to areas of specialty in his motion, Plaintiff waived any challenge to the ALJ's

substantive evaluation of Drs. Gilpeer's and Williams's opinions, the differing weights she

assigned to their opinions, and her reasons for doing so.  *See Indep. Towers of Washington v.*

*Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (finding party forfeited issue on appeal because

"[b]eyond its bold assertion, [plaintiff] provide[d] little if any analysis to assist the court in

evaluating its legal challenge") (citation omitted); *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d

1155, 1161 (9th Cir. 2008) ("We do not address this finding because [claimant] failed to argue this

issue with any specificity in his briefing.").  Accordingly, the ALJ's decision must be affirmed.

**E.      Plaintiff's Credibility**

        The ALJ found that Plaintiff's medically determinable impairments could cause the alleged

symptoms, but that his statements were not consistent with the medical evidence: "Overall, while

the objective evidence and exam findings support the claimant's allegations of a severe condition

in his left foot, there is not adequate and persuasive medical evidence establishing that he is

incapable of a reduced range of sedentary work." AR 20.  Plaintiff argues the ALJ erred because

she did not consider his symptoms of pain when determining he could perform sedentary work.

Pl.'s Mot. at 24-25.  Plaintiff maintains the ALJ did not consider that he has reduced joint motion

in the subtalar and ankle joints as documented by Dr. Benard, atrophy in his left foot, that his left

heel bone has a fixed everted position of five degrees, and he has an antalgic gait.  *Id.* at 25 (citing

---

[11] Citation is to prior version of 20 C.F.R. § 404.1527, in effect at the time of Plaintiff's claim.

AR 412, 719).  Plaintiff also maintains the ALJ did not consider his testimony that he lived at his mother's house, did not perform chores, did not drive, and spent his time on a couch with his foot propped up.  *Id.* (citing AR 50-52).  In response, Defendant argues the ALJ provided multiple valid reasons for finding Plaintiff's allegations of extreme symptoms were not entirely consistent with the objective medical evidence and other evidence in the record.  Def.'s Mot. at 17.

### 1.    Legal Standard

Congress expressly prohibited granting disability benefits based solely on a claimant's subjective complaints.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability"); 20 C.F.R. § 416.929(a) (an ALJ will consider all of a claimant's statements about symptoms, including pain, but statements about pain or other symptoms "will not alone establish" the claimant's disability).  "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to [the Social Security Act]."  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  An ALJ is, however, required to make specific credibility findings.  *See* SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996) (the credibility finding "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight").

A two-step analysis is used when determining whether a claimant's testimony regarding their subjective pain or symptoms is credible.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  First, it must be determined "whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc); 42 U.S.C. § 423(d)(5)(A)).  A claimant does not need to "show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)).

Second, if the claimant has met the first step and "there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering

specific, clear and convincing reasons for doing so.'" *Id.* (quoting *Smolen*, 80 F.3d at 1281). "The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen*, 80 F.3d at 1284. Courts must not engage in second-guessing, where the ALJ "has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record." *Fair*, 885 F.2d at 604. However, "a finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (citing *Lester*, 81 F.3d at 834); *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986) (per curiam), *superseded by statute on other grounds as recognized in Bunnell v. Sullivan*, 912 F.2d 1149, 1154 (9th Cir. 1990) ("'Excess pain' is, by definition, pain that is unsupported by objective medical findings.").

Factors an ALJ may consider in weighing a claimant's credibility include: "[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between [his] testimony and [his] conduct, claimant's daily activities, [his] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [claimant] complains." *Thomas*, 278 F.3d at 958-59 (quoting *Light*, 119 F.3d at 792). An ALJ's credibility finding must be properly supported by the record, and sufficiently specific to ensure a reviewing court he did not "arbitrarily discredit" a claimant's subjective testimony. *Id.* at 958 (citing *Bunnell*, 947 F.2d at 345-46).

### 2. Analysis

Here, the Court finds the ALJ met the substantial evidence standard by considering the regulatory factors and identifying the evidence underlying her findings. As a preliminary matter, although Plaintiff argues the ALJ did not consider his symptoms of pain in determining he could perform sedentary work, the ALJ's RFC assessment was for less than the full range of sedentary work. *See* SSR 96-9p, 1996 WL 374185, at *1 ("An RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment(s) and is expected to be relatively rare."). It is not that the ALJ disregarded Plaintiff's alleged symptoms at large and found that he could perform heavy, medium, light, or even a full range of sedentary

work. *See* 20 C.F.R. § 404.1567. Rather, the ALJ acknowledged that Plaintiff's foot injury and symptoms significantly limited his functional abilities, AR 22-25, but rejected his symptom allegations to the extent he alleged "he is incapable of . . . work that can be performed primarily while seated." AR 20-21 (medical and other evidence did "not demonstrate that [Plaintiff] has sustained a loss of functioning" beyond limitations in RFC). As the ALJ made explicit in her conclusion regarding Plaintiff's RFC: "[Plaintiff's] allegations are not entirely consistent with the record and he is able to perform a range of sedentary work." AR 25.

Plaintiff testified that he could not perform a full-time job involving mostly sitting and requiring very little lifting, stating that "[his] body [was] not even in shape to do that." AR 50. He testified he could only stand and sit each for 45 minutes, used a cane, and wore a brace that resembled a ski boot, which helped him balance and kept his foot stiff so he could move it. AR 48-50. He stated that he is most comfortable when "laying on the couch, propped up," that he watches television all day on the couch, and does not perform any household chores. AR 50-51. However, the ALJ cited to objective evidence in the record that was at odds with Plaintiff's allegations.

While Plaintiff had fractured metatarsals as a result of his injury, x-rays and radiographs showed that these fractures healed. AR 20, 350, 355-56, 409, 664. A radiograph in or around August 2015 revealed narrowing in the subtalar joint and the talonavicular joint. AR 20-21 (citing AR 718). The ALJ noted "generally mild clinical findings" to the extent that providers had observed at times: normal range of motion in the foot; no parathesia (tingling sensation), no weakness, nor evidence of distinct functional loss; no definite swelling in the distal foot; and no tenderness to palpitation of the lateral malleolus or medial malleolus (bony projections on sides of ankles), base of the fifth metatarsal, and over the anterior talofibular ligament (ligament near top of foot). AR 21, 316, 363, 571. Providers found that the subtalar joint, midfoot, and posterior heel were nontender and there was little to no tenderness to palpitation in the second tarsometatarsal joint. AR 21, 394, 459, 511, 530, 532, 613.

In addition, vascular examinations revealed that Plaintiff had normal capillary refill time and palpable pulses; upon neurological examination, providers observed normal muscle tone and

coordination, grossly intact sensation, no evidence of tendon or nerve injury, no hyperactivity, nor tenderness of the peripheral nerves. AR 21, 363, 409, 616, 658-59, 661-62, 664, 729, 731, 735, 747, 761. The ALJ noted providers observed "negative equinus" upon certain examinations (limited upward bending of the ankle joint and found generally full strength on muscle testing). AR 21, 409, 571, 718, 737-38, 741-42 (testing 4 to 4.5 out of 5 on the left lower extremity).

The ALJ acknowledged that providers made some "abnormal clinical findings," including tenderness to palpitation along the metatarsals, skin discoloration, and swelling. AR 21-22. Providers also observed "rigid hindfoot," a tender posterior heel, equinus (at times) and decreased range of motion, and antalgic gait. *Id.* Plaintiff also identifies certain objective findings that are the "result of" his impairments, namely reduced joint motion, left foot atrophy, antalgic gait, and the left heel bone with a "fixed everted position of 5 degrees." Pl.'s Mot. at 25. However, he fails to show how these findings support his allegation that his symptoms prevented him from being able to perform work primarily while sitting. While the findings highlighted by Plaintiff indicate that symptoms may limit the ability to stand and/or walk, the ALJ accommodated his symptom allegations to the extent they could fairly be reconciled with this objective medical evidence, finding that Plaintiff could stand/walk for up to 30 minutes during the workday and could otherwise work while sitting. AR 19. Based on this reasoning, the Court finds the ALJ reasonably found the objective evidence did not support the remaining extent of Plaintiff's claimed limitations, which was a proper consideration in evaluating his self-reported symptoms. *See* 20 C.F.R. § 404.1529(c)(2).

Plaintiff argues there is "no discussion in the decision" beyond objective medical evidence supporting the ALJ's finding concerning his symptom allegations. Pl.'s Mot. at 25. However, this is belied by explicit language in the ALJ's decision that the "[RFC] assessment is supported by generally mild clinical findings on examination, the treatment records, the claimant's statements, and the medical opinions as appropriately weighed. As such, the [ALJ found] that the claimant's allegations are not entirely consistent with the record and he is able to perform a range of sedentary work." AR 25; *see* AR 20-25 (discussion concerning the "intensity, persistence and limiting effects of [alleged] symptoms").

The ALJ also relied on statements made by Plaintiff that conflicted with the extent of his alleged functional limitations. 20 C.F.R. § 404.1529(c)(4) ("[The agency] will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [a claimant's] statements and the rest of the evidence."); SSR 16-3p, 2017 WL 5180304, at *8 ("[the agency] will consider the consistency of the individual's own statements"). Specifically, the ALJ referenced Plaintiff's statements and reports of improved symptoms throughout the record. AR 21-22. The ALJ noted that Plaintiff consistently denied any numbness, tingling, or radiation. AR 21 (citing AR 388, 427, 511, 578, 620, 657, 661, 663, 667, 669, 728, 732, 734, 753, 755, 760). He had varying responses to injections, anywhere from "some benefit" or "less symptomatic" to "more than 95%" to "almost 100% relief of symptoms." AR 21-22 (citing AR 388, 532, 613, 620, 669). The ALJ noted Plaintiff reported that use of orthotics and a brace helped and resulted in some symptom improvement. AR 21 (citing AR 458, 496, 530, 667, 669, 717). Plaintiff also reported having less foot pain with physical therapy, was noted to have "less" antalgia, and, at times, having no pain across particular foot joints. AR 21-22 (citing AR 558-59, 562, 738). The ALJ did not cite the above evidence and conclude that Plaintiff's symptoms improved completely; rather, the ALJ found his symptoms were managed to a degree such that he could perform work as limited in the RFC. The ALJ reasonably noted that Plaintiff's reports of improvement and obtaining some relief from orthotics, a brace, and injections contradicted his allegation that he could not even perform a job involving mostly sitting. AR 20-22, 25.

In sum, the Court finds Plaintiff's inconsistent statements were a valid consideration in evaluating symptom allegations, and the ALJ identified substantial evidence supporting this reason. *See Tommasetti*, 533 F.3d at 1039 (the ALJ may consider "ordinary techniques of credibility evaluation," including inconsistencies in a claimant's statements and between a claimant's statements and the record). Accordingly, the Court finds that the ALJ's decision regarding Plaintiff's credibility is supported by substantial evidence and free of legal error, and therefore it must be affirmed.

**F.     Sedentary Work (RFC Finding)**

The ALJ determined Plaintiff has the RFC to perform sedentary work with limitations.  AR 19.  Plaintiff contends the ALJ erred in establishing this RFC because she "cherry picked through the evidence and misconstrued the evidence," arguing that the "fact that [he] can walk on his foot with pain does not mean he can perform sedentary work."  Pl.'s Mot. at 17.  He contends that, although the ALJ "cited to selected pages in the record which show that Mr. Plaintiff had received injections and those provided relief," the relief was only temporary.  *Id.* at 18.  He further argues that although the ALJ pointed to areas of the record showing Plaintiff's symptoms improved with orthotics, a brace, and a cane, "this does not mean he was able to effectively ambulate and/or be free of pain such that he could work at a full time job."  *Id.* at 19.  Finally, Plaintiff argues the ALJ "cherry picked through the evidence to find what was normal about [his] foot in order to try to prove that he had mild clinical findings," but "[h]is doctors felt that he had complex issues with his left ankle (AR 664) and a significant injury to his ankle (AR 412)."  *Id.* at 20.  Plaintiff maintains that such "cherry picking is impermissible" and grounds for remand for proper consideration of the evidence.  *Id.* at 20-21.

In response, Defendant argues the ALJ's RFC is supported by substantial evidence showing Plaintiff could perform "less than normal" sedentary jobs with the limitations she provided.  Def.'s Mot. at 22-23.

**1.     Legal Standard**

RFC is the most a claimant can do despite his limitations.  20 C.F.R. § 404.1545(a)(1).  It is assessed by considering all the relevant evidence in a claimant's case record.  *Id.*; *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971).  When a case is before an ALJ, it is the ALJ's responsibility to assess a claimant's RFC.  20 C.F.R. § 404.1546(c); *see also Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001) ("It is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity.").  "Generally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion."  20 C.F.R. § 416.927(c)(4).

### 2. Analysis

Having reviewed the record, the Court finds the ALJ's RFC finding is supported by substantial evidence. Sedentary work is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a). Here, the ALJ found Plaintiff could not perform the full range of sedentary work but instead imposed specific limitations:

> [Plaintiff] cannot use foot controls with the left lower extremity. He can never climb ladders, ropes, or scaffolds, kneel, crouch, and crawl. He can occasionally climb ramps/stairs, balance, and stoop. He requires the use of a cane in the non-dominant hand for all walking and standing. Standing and walking is limited to 30 minutes total during the workday. He can never be exposed to heights or moving machinery.

AR 19. "An RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment(s)." SSR 96-9p, 1996 WL 374185, at *1. In particular, "[j]obs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday." *Id.* at *3; 20 C.F.R. § 416.967(a). The ALJ's assigned RFC limited Plaintiff to less than full sedentary work, limiting standing/walking to no more than 30 minutes in a workday. AR 19. And, as discussed above, Plaintiff has failed to establish that he cannot sustain standing/walking for this total amount of time, nor why he cannot otherwise work while sitting. Plaintiff generally argues his clinical findings were "not mild" but provides no explanation for why healed fractures, tender foot joints, decreased range of motion, antalgic gait, and other "non-mild" findings prohibited sitting.

Further, Plaintiff fails to address the analysis that the ALJ undertook before reaching the assigned RFC. AR 20-25. Indeed, the ALJ assigned Plaintiff's RFC only after "determining credibility, resolving conflicts in medical testimony, and [] resolving ambiguities," which is the ALJ's, not the Court's responsibility. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)

(citing *Magallanes*, 881 F.2d at 750). While recognizing the evidence showing Plaintiff did have pain, the ALJ properly reconciled conflicting levels of pain and improvement by reducing the range of sedentary work that he could perform so that Plaintiff would only stand/walk for up to 30 minutes per workday. *Batson*, 359 F.3d at 1195 ("When presented with conflicting medical opinions, the ALJ must . . . resolve the conflict."). And, as discussed above, to the extent the ALJ rejected particular opinions of Drs. Lehnert and Benard, she provided sufficient explanations for doing so. AR 22-24. "If the ALJ's finding is supported by substantial evidence, the court 'may not engage in second-guessing.'" *Tommasetti*, 533 F.3d at 1039 (quoting *Thomas*, 278 F.3d at 958.

Accordingly, the Court finds substantial evidence supported the ALJ's findings, and the Court must therefore affirm the ALJ's RFC finding.

## VI.  CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiff's motion and **GRANTS** Defendant's cross-motion. The Court shall enter a separate judgment, after which the Clerk of Court shall terminate the case.

**IT IS SO ORDERED.**

Dated: March 21, 2019

THOMAS S. HIXSON
United States Magistrate Judge